UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE WELMON, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>CHICAGO BRIDGE & IRON CO. NV, GERALD M. GLENN, ROBERT B. JORDAN and RICHARD E. GOODRICH,<br><br>            Defendants. | Case No. 06-1283<br><br>__CLASS ACTION__<br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Chicago Bridge & Iron Co. NV ("Chicago Bridge" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the securities of Chicago Bridge between March 9, 2005, and February 3, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6.     Plaintiff Wayne Welmon, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Chicago Bridge at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Chicago Bridge is a Netherlands corporation which maintains its principal executive offices in the Netherlands.  Chicago Bridge operates as an engineering, procurement, and construction company and offers conceptual design, engineering, procurement, fabrication, field erection, mechanical installation, and commissioning services.

8.     (a)     Defendant Gerald M. Glenn ("Glenn") was, at all relevant times, Chairman, President and Chief Executive Officer of Chicago Bridge.

(b)     Defendant Robert B. Jordan ("Jordan") was, at all relevant times, Chicago Bridge's Executive Vice Officer and Chief Operating Officer.

(c)     Defendant Richard E. Goodrich ("Goodrich") was, at all relevant times, Chicago Bridge's Chief Financial Officer.

(d)     Defendants Glenn, Jordan and Goodrich are collectively referred to herein as the "Individual Defendants."

- 2 -

9.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Chicago Bridge, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Chicago Bridge, each of the Individual Defendants had access to the adverse undisclosed information about Chicago Bridge's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Chicago Bridge and its business issued or adopted by the Company materially false and misleading.

- 4 -

13.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Chicago Bridge common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Chicago Bridge's business, operations, management and the intrinsic value of Chicago Bridge common stock; and (ii) caused Plaintiff and other members of the Class to purchase Chicago Bridge common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Chicago Bridge during the Class Period and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Chicago Bridge common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Chicago Bridge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.      Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chicago Bridge; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.    Defendant Chicago Bridge operates as an engineering, procurement, and construction company and offers conceptual design, engineering, procurement, fabrication, field erection, mechanical installation, and commissioning services.

22.    On March 9, 2005, Chicago Bridge issued a press release announcing its financial results for fiscal year 2004, the year ended December 31, 2004. The Company reported net income of $65.9 million or $1.33 per share for fiscal 2004. Defendant Glenn commented on the results stating in pertinent part as follows:

We are pleased to report that results exceeded expectations for the fourth quarter of 2004. . . For the year, substantial backlog going into 2004 led to record revenue as projects moved into the construction phase, and a second consecutive year of record sales means we have entered 2005 in an even stronger position. Our safety results have been excellent and our balance sheet is solid. We are pleased that our financial strength has allowed us to

increase the return to CB&I's shareholders by means of our recently-announced stock split and dividend increase.

The press release contained the following revenue and earnings guidance:

The Company is issuing the following guidance for new business taken, revenue and earnings per share (EPS) for 2005: new business taken is expected to be in a range of $2.2-$2.4 billion for full-year 2005; revenue is expected to be in a range of $425-$450 million for the first quarter and $2.0-$2.2 billion for full-year 2005; and EPS is expected to be in a range of $0.29-$0.31 (pre-split) for the first quarter and $1.80-$1.85 (pre-split) for full-year 2005.

23.     On April 27, 2005, Chicago Bridge issued a press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005.  The Company reported net income of $15.8 million or $0.16 per share for the first quarter of 2005.  Defendant Glenn commented on the results stating in pertinent part as follows:

We're pleased to report that CB&I is off to a great start for 2005. . . With record backlog going into the year, another very strong quarter for new business, and with earnings and revenue on target for the quarter, we anticipate the Company's performance will continue to improve.

24.     On May 16, 2005, Chicago Bridge issued a press release announcing it had begun to buy back shares under the Company's existing stock repurchase program which reflected "management's belief that CB&I shares are a good investment at current prices."  Defendant Glenn commented on the announcement stating in pertinent part as follows:

The stock repurchases help minimize the effect of share issuances under our employee compensation plans, and also reflect our continued commitment to enhance long-term shareholder value. With more than $237 million of cash on hand at the end of the first quarter of 2005 and prospects for continued strong cash generation, we have the financial strength and flexibility to both return excess cash to shareholders and continue our pursuit of suitable acquisitions that meet our criteria for success.

The Company's outlook for 2005 remains on target, with earnings expectations in line with current consensus estimates. . . Our global

operations continue to perform well. Our record level of new business taken gives us confidence that we will be able to meet our goals for 2005 and beyond. Our market outlook remains strong. On this basis, we view our stock as undervalued at current levels.

25.     On July 27, 2005, Chicago Bridge issued a press release announcing its financial results for the second quarter of 2005, the period ending June 30, 2005. The Company reported net income of $21.1 million or $0.21 per share as compared to $4.9 million, or $0.05 per share, for the same period in 2004. Defendant Glenn commented on the positive results stating in pertinent part as follows:

It is gratifying to report that CB&I earnings grew substantially in the second quarter. . . With new business taken of $2.0 billion for the first half, and solid prospects for the balance of the year, we now expect full-year 2005 new business taken to reach at least $3.0 billion, up about 30% from our previous guidance of $2.2-$2.4 billion.

26.     On August 8, 2005, Chicago Bridge filed its Form 10-Q for the quarter ended June 30, 2005, with the SEC which was signed by Defendants Glenn and Goodrich and confirmed the previously announced financial results (the "Second Quarter 10-Q"). The Second Quarter 10-Q represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

The accompanying unaudited condensed consolidated financial statements for Chicago Bridge & Iron Company N.V. ("CB&I") have been prepared pursuant to the rules and regulations of the U.S. Securities and Exchange Commission. In the opinion of management, our unaudited condensed consolidated financial statements include all adjustments, which are of a normal recurring nature, necessary for a fair presentation of our financial position as of June 30, 2005, our results of operations for each of the three-month and six month periods ended June 30, 2005 and 2004, and our cash flows for each of the six-month periods ended June 30, 2005 and 2004.

- 9 -

With respect to revenue recognition, the Second Quarter 10-Q represented that the Company

recognized revenue pursuant to the percentage of completion method stating in pertinent part

as follows:

> Revenue is recognized using the percentage-of-completion method. A significant portion of our work is performed on a fixed price or lump sum basis. The balance of our work is performed on variations of cost reimbursable and target price approaches. Contract revenue is accrued based on the percentage that actual costs-to-date bear to total estimated costs. We utilize this cost-to-cost approach as we believe this method is less subjective than relying on assessments of physical progress. We follow the guidance of the Statement of Position 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts," for accounting policies relating to our use of the percentage-of-completion method, estimating costs, revenue recognition and unapproved change order/claim recognition. The use of estimated cost to complete each contract, while the most widely recognized method used for percentage-of-completion accounting, is a significant variable in the process of determining income earned and is a significant factor in the accounting for contracts. The cumulative impact of revisions in total cost estimates during the progress of work is reflected in the period in which these changes become known. Due to the various estimates inherent in our contract accounting, actual results could differ from those estimates.

The Second Quarter 10-Q also included Sarbanes-Oxley certifications signed by Defendants

Glenn and Goodrich.   In their respective certifications, Defendants Glenn and Goodrich

represented, among other things, that "based on my knowledge this report does not contain

any untrue statement of material fact or omit to state a material fact necessary to make the

statements made. . . not misleading. . . ."

     27.    On October 11, 2005, Chicago Bridge issued a press release announcing that

Defendant Goodrich had resigned his positions with the Company.

28.     On October 26, 2005, Chicago Bridge issued a press release announcing that it would be delaying the release of its third quarter financial results because the results were not "finalized in time to meet the original schedule."

29.     Then, on October 31, 2005, Chicago Bridge issued a press release announcing that the delay in its release of third quarter financial results was "precipitated by a memo from a senior member of CB&I's accounting department alleging accounting improprieties, including the determination of claim recognition on two projects and the assessment of costs to complete two projects."  Defendant Glenn commented on the announcement stating in pertinent part as follows:

> As indicated, the Audit Committee of the Board of Directors will be conducting an investigation of the matter with the full cooperation of management. However, based on the information the acting Chief Financial Officer and I currently have, we believe that the overall earnings capacity, financial viability, growth potential and strong cash position of the Company will remain intact and the magnitude of the claim recognition and cost to complete issues with respect to the above projects appear to represent $0.09 to $0.11 per share in the third quarter.

30.     In response to the news of accounting problems, on October 27, 2005, the price of Chicago Bridge stock declined from $29.72 per share to $23.50 per share, on extremely heavy trading volume and then further declined to $20.31 per share on October 28, 2005.

31.     On November 11, 2005, Chicago Bridge issued a press release announcing that it would be unable to file its Form 10-Q for the third quarter of 2005 on a timely basis due to the internal accounting investigation.  In an effort to downplay the severity of the accounting issues facing the Company, Defendants also highlighted seemingly positive financial information in the press release.  In this regard, the press release stated that new

business and cash on hand had increased compared with the "2004 period". Defendant Glenn further commented stating in pertinent part as follows:

> Based on the information the acting Chief Financial Officer and I currently have, we believe that the overall earnings capacity, financial viability, growth potential and strong cash position of the Company will remain intact. . . The Company had unaudited cash and cash equivalents of $222.9 million at the end of the third quarter of 2005, compared with $143.3 million at the end of the third quarter of 2004. CB&I had unaudited cash in excess of debt of $166.1 million at September 30, 2005, compared with $151.7 million at December 31, 2004.

32.     In the days following the issuance of this press release, Defendants made presentations at several investor conferences – presenting at the Bank of America 2005 Energy Conference on November 15, 2005 and Lehman Brothers Second Annual Small Cap Conference on November 17, 2005. In the presentations, Defendant Glenn downplayed the accounting issues facing the Company and highlighted its connections with the oil industry.

33.     Defendants' efforts worked and the price of Chicago Bridge stock rebounded sharply rising from $22.39 per share on November 10, 2005 to $31.20 per share on January 30, 2006.

34.     The statements referenced above in ¶¶22-26, 29 and 31-32 were each materially false and misleading when issued because they misrepresented and failed to disclose the following material adverse facts:

(a)     that the Company was materially overstating its financial results by failing to properly utilize percentage-of-completion accounting;

(b)     that the Company was not following its publicly stated revenue recognition policies;

- 12 -

(c)    as a result of the foregoing, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and therefore were materially false and misleading.

35.    Then, on February 3, 2006, after the close of the market, Chicago Bridge issued a press release announcing the terminations of Defendants Glenn and Jordan and that it would further elaborate on the terminations on a conference call the week of February 13, 2006.

36.    Two hours after the announcement of the terminations, an attorney representing Defendants Glenn and Jordan issued a press release representing that they had been terminated in connection with the Company's internal accounting investigation.

37.    In response to these announcements, on February 6, 2005, the price of Chicago Bridge stock dropped from $29.00 per share to $22.33 per share on extremely heavy trading volume.

38.    The market for Chicago Bridge's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Chicago Bridge's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Chicago Bridge common stock relying upon the integrity of the market price of Chicago Bridge's common stock and market information relating to Chicago Bridge, and have been damaged thereby.

39.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Chicago Bridge's common stock, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

40.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Chicago Bridge's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Chicago Bridge and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market the inflation in the price of Chicago Bridge stock was removed and the price of Chicago Bridge stock declined dramatically causing loss to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

41.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Chicago Bridge, their control over, and/or receipt and/or modification of Chicago Bridge's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Chicago Bridge, participated in the fraudulent scheme alleged herein.

42.    In addition, Defendants were motivated to engage in the fraudulent scheme alleged herein in order to enable them to sell their personally-held Chicago Bridge common stock to the unsuspecting public. The following chart sets forth the insider trading:

|  | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Glenn, Gerald** | 3/18/05 | 35,200 | $22.87 | $   804,848.00 |
|  | 3/21/05 | 40,208 | $22.51 | $   904,881.00 |
|  | 3/22/05 | 128,992 | $22.96 | $ 2,961,011.00 |
|  | 3/24/05 | 92,200 | $22.04 | $ 2,031,627.00 |
|  | 3/28/05 | 54,400 | $22.19 | $ 1,206,864.00 |
| **Total** |  | **351,000** |  | **$ 7,909,231.00** |
| **Goodrich, Richard** | 3/18/05 | 35,200 | $22.87 | $  804,848.00 |
|  | 3/21/05 | 40,208 | $22.51 | $  904,881.00 |
| **Total** |  | **75,408** |  | **$1,709,729.00** |
| **Jordan, Robert** | 3/18/05 | 155,740 | $22.87 | $ 3,560,995.00 |
|  | 3/21/05 | 100,000 | $22.51 | $ 2,250,500.00 |
| **Total** |  | **255,740** |  | **$5,811,495.00** |
| **Grand Total** |  | **682,148** |  | **$15,430,455.00** |

**Applicability Of Presumption Of Reliance:**
**Fraud On The Market Doctrine**

43.     At all relevant times, the market for Chicago Bridge's common stock was an efficient market for the following reasons, among others:

(a)     Chicago Bridge's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Chicago Bridge filed periodic public reports with the SEC and the NYSE;

(c)     Chicago Bridge regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Chicago Bridge was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for Chicago Bridge's common stock promptly digested current information regarding Chicago Bridge from all publicly-available sources and reflected such information in Chicago Bridge's stock price.  Under these circumstances, all purchasers of Chicago Bridge's common stock during the Class Period suffered similar injury through their purchase of Chicago Bridge's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Chicago Bridge who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

46.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Chicago Bridge's common stock

at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Chicago Bridge's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Chicago Bridge as specified herein.

50.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Chicago Bridge's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Chicago Bridge and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions,

practices and a course of business which operated as a fraud and deceit upon the purchasers of Chicago Bridge common stock during the Class Period.

51.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

52.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Chicago Bridge's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and

misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Chicago Bridge's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Chicago Bridge's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Chicago Bridge common stock during the Class Period at artificially high prices and were damaged thereby.

54.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Chicago Bridge was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Chicago Bridge common stock, or, if they had acquired such common stock

during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**

**Violation of Section 20(a) of
The Exchange Act Against the Individual Defendants**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of Chicago Bridge within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, Chicago Bridge and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  February 17, 2006          LERACH COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                    SAMUEL H. RUDMAN (SR-7957)
                                    DAVID A. ROSENFELD (DR-7564)



                                    _____
                                          SAMUEL H. RUDMAN

                                    58 South Service Road, Suite 200
                                    Melville, NY 11747
                                    Telephone: 631/367-7100
                                    631/367-1174 (fax)


G:\srudman\complaint (chicago bridge).doc