## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE WELMON, Individually and on Behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   vs.<br><br>CHICAGO BRIDGE & IRON CO. N.V., GERALD M. GLENN, ROBERT B. JORDAN, and RICHARD E. GOODRICH,<br><br>        Defendants. | 06-CV-01283 (JES) |

### CHICAGO BRIDGE & IRON CO. N.V. AND RICHARD E. GOODRICH'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel:    202-663-6000
Fax:   202-663-6363

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

REVIEW OF RELEVANT FACTS ........................................................................................2

ARGUMENT......................................................................................................................11

ALL THREE PROPOSED REPRESENTATIVES ARE ATYPICAL OF THE POST-OCTOBER
PURCHASERS, AND THEY ARE ALL INADEQUATE AS TO THE ENTIRE CLASS....................11

I.    Plaintiffs' Burden Under Rule 23 ................................................................................11

II.   The Proposed Class Representatives are Atypical ........................................................12

    A.    Fortis and Metzler Are Atypical on Account of Their Knowledge of the Risks of the Disclosed
        Accounting Improprieties and Their Highly Speculative Trading Strategies..............................12

    B.    By His Own Admission, Mr. Mundy is Clearly Atypical of the Post-October 31 Purchasers ......16

III.  No Class Can Be Certified Because All The Proposed Class Representatives Are Inadequate .........17

    A.    Fortis and Metzler Are Inadequate on Account of Their Failure to Monitor the Litigation and
        Their Blind Reliance Upon Counsel........................................................................17

    B.    Mr. Mundy Is Inadequate Because He Also Has Failed to Monitor the Litigation and Possesses
        Very Little Knowledge of the Case........................................................................23

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
   106 F.3d 11 (2d Cir. 1997) ...........................................................................22

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ...................................................................................17

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ................................................................ 12, 14, 15, 16

*Beck v. Status Game Corp.*,
   No. 89-Civ-2923, 1995 WL 422067 (S.D.N.Y. July 14, 1995) ................................. 17, 23

*Berwecky v. Bear, Stearns & Co.*,
   197 F.R.D. 65 (S.D.N.Y. 2000) ...................................................................... 12, 14

*Connecticut v. Phys. Health Servs. of Conn., Inc.*,
   287 F.3d 110 (2d Cir. 2002) ...........................................................................22

*Darvin v. Int'l Harvester Co.*,
   610 F. Supp. 255 (S.D.N.Y. 1985) ...................................................................23

*Davidson v. Citizens Gas & Coke Utility*,
   238 F.R.D. 225 (S.D. Ind. 2006) .....................................................................22

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005).....................................................................................12

*Epstein v. Am. Reserve Corp.*,
   No. 79-c-4767, 1985 WL 2598 (N.D. Ill. Sept. 18, 1985)..............................13, 18, 19

*Ferrari v. Impath, Inc.*,
   No. 03-Civ- 5667, 2004 WL 1637053 (S.D.N.Y. July 20, 2004) ....................................18

*Ferraro v. Gen. Motors Corp.*,
   105 F.R.D. 429 (D.N.J. 1984) ........................................................................19

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   119 F.R.D. 344 (S.D.N.Y. 1988)..................................................................12, 13

*Greenspan v. Brassler*,
   78 F.R.D. 130 (S.D.N.Y. 1978) ......................................................................19

*Hevesi v. Citigroup, Inc.*,
   366 F.3d 70 (2d Cir. 2004) .......................................................................18, 19

*Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*,
   354 F. Supp. 2d 18 (D. Mass. 2000) .................................................................25

*In re Cendant Corp. Sec. Litig.*,
  264 F.3d 201 (3d Cir. 2001)……………………………………………………...19, 20, 22, 24

*In re Cornerstone Propane Partners, L,P. Sec. Litig.*,
  No. 03-2522, 2006 WL 1180267 (N.D. Cal. May 3, 2006) ...........................................12

*In re Deutsche Telekom Ag Sec. Litig.*,
  229 F. Supp 2d 277 (S.D.N.Y. 2002) .........................................................................15

*In re Network Assoc., Inc. Sec. Litig.*,
  76 F. Supp. 2d 1017 (N.D. Cal. 1999) .......................................................................24

*In re Organogenesis Sec. Litig.*,
  No. 04-cv-10027, 2007 U.S. Dist. LEXIS 18795 (D. Mass. March 15, 2007) ...................22

*In re Safeguard Scientifics*,
  216 F.R.D. 577 (E.D. Pa. 2003) .................................................................13, 16, 24

*In re Sonus Networks, Inc. Sec. Litig.*,
  229 F.R.D. 339 (D. Mass. 2005) ...............................................................................24

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1983)………………………………………………………...14, 22

*Kline v. Wolf*,
  88 F.R.D. 696 (S.D.N.Y. 1981)……...…………………………………………………14

*Koenig v. E.M. Benson*,
  117 F.R.D. 330 (E.D.N.Y. 1987)...............................................................................13

*Koppel v. 4987 Corp.*
  1999 U.S. Dist. LEXIS 12340 (S.D.N.Y. Aug. 9, 199)…………………………………...18

*Kovaleff v. Piano*,
  142 F.R.D. 406 (S.D.N.Y. 1992) ...........................................................................13, 17

*LaSala v. Needham & Co.*,
  No. 04-Civ. 9237, 2006 WL 452024 (S.D.N.Y. Feb. 24, 2006) ...................................22

*Linn v. Allied Ir. Banks, PLC*,
  No. 02-civ-1738, 2004 U.S. Dist. LEXIS 24655 (S.D.N.Y. Dec. 8, 2004) .......................18

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995).....................................................................................18

*McDaniel v. County of Schenectady*,
  No. 04-cv-757, 2005 U.S. Dist. LEXIS 14852 (N.D.N.Y. July 21, 2005) .........................21

*Miles v. Merrill Lynch, et al. (In re Initial Public Offering Sec. Litig.)*,
  471 F.3d 24 (2d Cir. 2006) .............................................................................11, 12, 15

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ................................................................. 17

*Norman v. Arcs Equities Corp.*,
   72 F.R.D. 502 (S.D.N.Y. 1976) ............................................................... 21

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
   136 F.R.D. 658 (D. Ore. 1991) ............................................................... 13

*Scott v. New York City Dist. Council of Carpenters' Pension Plan*,
   224 F.R.D. 353 (S.D.N.Y. 2004) ....................................................... 18, 23

*Weinberg v. Atlas Worldwide Holdings, Inc.*,
   216 F.R.D. 248 (S.D.N.Y. 2003) ............................................................. 18

*Zemel Family Trust v. Philips Int'l Realty Corp.*,
   205 F.R.D. 434 (S.D.N.Y. 2002) ............................................................. 22

Legislative History

H.R. Conf. Rep. No. 104-369 (1995)
   1995 U.S.C.C.A.N. 679 ........................................................................... 18

Federal Rules

Fed. R. Civ. P. 23 .................................................................................... 11

**<u>INTRODUCTION</u>**

Plaintiffs seek to certify a class of investors who purchased shares in Chicago Bridge & Iron Company N.V. ("CB&I" or "the Company") between March 9, 2005 and February 3, 2006. However, none of the putative representatives are typical of those who purchased after October 31, 2005. Moreover, all of the proposed representatives are inadequate as to the entire proposed class. Accordingly, certification should be denied.

In particular, the two institutional plaintiffs, Fortis Investment Management N.V./S.A. ("Fortis") and Metzler Investment GmbH ("Metzler"), are atypical because of their unique, high-risk trading strategies by which they sought out CB&I as a "fallen angel" (Fortis) and a "turnaround situation" (Metzler). The timing and circumstances of their CB&I purchases late in, *and even after*, the proposed class period also render them atypical. Moreover, Fortis and Metzler are inadequate: besides failing to preserve relevant documents (Fortis), filing incorrect certifications (Metzler), and only considering litigation after being solicited by Milberg Weiss (both Fortis and Metzler), they each defer entirely to counsel, read only what is put in front of them, fail to monitor expenses, have not negotiated attorneys fees, and have hired attorneys for themselves to replace the indicted Milberg Weiss while failing to take the identical action for the class.

Plaintiff's late addition of Mr. Mundy is of no help. Instead of addressing the typicality and adequacy concerns which prompted the Court at its November 7 hearing to suggest that Plaintiffs' counsel add a representative before class discovery because "we have got to have the right class representatives," and "it is going to be awfully difficult to have a person represent people who bought during that initial period ….," Plaintiffs chose to proffer Mr. Mundy who only purchased *before* October 31 and therefore is not a typical and adequate post-October 31 representative. Indeed, Mr. Mundy testified that he probably *would not* have purchased after October in light of analyst warnings and the Company's October 31 announcement that it would delay releasing its third quarter financial results due to the discovery of accounting problems and the initiation of a full-scale independent investigation. Moreover, like Fortis and Metzler, Mundy is inadequate because he has failed to monitor the litigation,

deferred to counsel in all matters, filed an erroneous Certification "under penalty of perjury," and lacks an adequate understanding of the case and proceedings (needing to rely upon a note card in his deposition to know the class period, the identity of lead plaintiffs, the identity of lead counsel, and the procedural posture of the case).

Accordingly, due to Fortis's, Metzler's and Mr. Mundy's inadequacies, the proposed class should not be certified at all, and in any event cannot be certified after October 31, 2005.

## REVIEW OF RELEVANT FACTS

### Fortis's and Metzler's Atypical Investments

Plaintiffs endeavor to represent a class of investors who, according to the Complaint, purchased shares of CB&I at prices allegedly inflated by unknown accounting issues. *See*, *e.g.*, Compl. at ¶ 125 (alleging Defendants used "improper accounting practices" to inflate price of CB&I stock). However, unlike the class described in the Complaint (the allegations of which the defendants deny), the two institutional plaintiffs bought CB&I stock only *after* the Company announced that it would delay releasing its third quarter 2005 financial results due to accounting issues.

In particular, on October 31, 2005, well before Fortis's and Metzler's first purchases on December 14, 2005 and January 30, 2006, respectively, CB&I explained that

> [T]he delay in releasing third quarter 2005 financial results was precipitated by a memo from a senior member of CB&I's accounting department alleging accounting improprieties, including the determination of claim recognition on two projects and the assessment of costs to complete two projects.

*See* CB&I October 31, 2005 Press Release, attached as Exhibit A to the Declaration of Colin M. Huntley filed herewith ("Huntley Decl."). Making clear that the Company would not know the full scope of its potential problems until much later, CB&I advised:

> Resolution of the allegations could be time consuming pending the completion of an independent investigation initiated by the Company's Audit Committee. No time frame has been set for completion at this time.

*Id*. The Company also disclosed the current earnings impact of the four projects about which it was then aware: "based on the information [we] currently have," the impact of the accounting issues on the specified projects "appear[s] to represent $0.09 to $0.11 per share in the third quarter." *Id*. Thereafter, on November 11, 2005, CB&I updated its shareholders and explained that in light of the ongoing investigation into its accounting practices, it would not be able to timely file its quarterly report on Form 10-Q for the third quarter of 2005, that the Audit Committee of the Company's Supervisory Board of Directors "[had] initiated an inquiry and [had] retained outside legal and accounting advisors to assist in the inquiry," and that the Company was not able to predict the outcome of the ongoing investigation until it was completed. See CB&I November 11, 2005 Press Release, Huntley Decl., Ex. B.

As discussed more fully below, CB&I's announcements and subsequent analyst reports warning of increased risks did not stop Fortis and Metzler from investing in CB&I. Instead, unlike those who purchased before CB&I's disclosures (and to whom Fortis and Metzler inexplicably claim to be similar), Fortis and Metzler each bought knowing of those risks and are therefore atypical and inadequate.

In particular, deposition testimony establishes that both Fortis and Metzler were aware that the Company disclosed accounting improprieties and the need for a further independent investigation before they chose to invest in CB&I. In his deposition, Fortis's Mr. Martin conceded several times that Fortis's investment manager, Mr. Stout, was aware of the accounting issues:

> Q: But he [Mr. Stout] did know that there was an ongoing investigation into the accounting improprieties, correct, before he purchased?
>
> A: Yes. (Martin Dep. 16:6-9, Feb. 9, 2007)[1]
>
> * * *
>
> Q: Taking a look at exhibit 14 [CB&I's Oct. 31, 2005 press release] . . . is this the announcement that you were referring to earlier that Mr. Stout had seen, whereby he knew in October that CBI had accounting improprieties and was conducting an examination and investigation?
>
> A: (Pause). Yes, it must have been. (*Id*. at 161:15-22)

---

[1]     All citations to the deposition transcripts of Fortis's Paul Martin, Metzler's Stefanie Buchmann and Walter J. Mundy are to the deposition transcripts filed by Plaintiffs with their Motion for Class Certification on March 2, 2007, and attached to the supporting Declaration of Steven J. Toll as Exhibits 2, 3 and 4, respectively.

Ms. Buchmann similarly testified on behalf of Metzler that it knew of the accounting problems that delayed the release of CB&I's third quarter financial results and, in fact, conceded that this alone differentiates Metzler from pre-October 31 purchasers:

> Q: So you and other people in the market after October 31 knew that Chicago Bridge & Iron had accounting problems with costs and claims; correct?
>
> A: Correct.
>
> Q: And the people who bought prior to this date certainly didn't know that; correct?
>
> A: Correct.
>
> Mr. Weprin: Object to the form of the question.
>
> Q: So they are different?
>
> A: Yes, in the form of that information, they are different.
> (Buchmann Dep. 220:19-21:6, Jan. 15, 2007)

Moreover, both Fortis and Metzler were further aware that analysts had highlighted the risks associated with purchasing CB&I stock after the Company's announcements. *See*, *e.g.*, Martin Dep. 24:7-9 (testifying that Fortis read analysts' reports and public disclosures before making investment decisions); Buchmann Dep. 263:21-264:2 (testifying that Metzler "reviewed lots of information," including analyst reports and press releases prior to purchasing CB&I stock). Notably, many of the analyst reports warned of the risk that CB&I would discover broader problems during its then-ongoing independent investigation. For example, as early as October 27, 2005, Sanders Morris Harris Group issued a report lowering its investment rating on CB&I and recommending *against* buying shares because of the lack of information concerning the delay in reporting third quarter financial results. *See* Sanders Morris Harris Group Oct. 27, 2005 Report, Huntley Decl., Ex. C. Similarly, an October 31, 2005 analyst report from Sidoti & Co. recommended that "investors avoid [CB&I] shares until information on accounting issues solidifies," and lowered its investment rating for CB&I to "neutral." Sidoti & Co. Oct. 31, 2005 Report, Huntley Decl., Ex. D. With regard to the impact on earnings, the Sidoti & Co. report concluded that "there is risk beyond that one-time earnings figure," *id.*, a sentiment shared by D.A. Davidson & Co., which, in a report the same day, lowered its investment rating and warned investors that "the risk of

- 4 -

broader accounting improprieties is increased." D.A. Davidson & Co. Oct. 31, 2005 Report, Huntley

Decl., Ex. E (emphasis added).

As their deposition testimony indicates, unlike other investors, Fortis's and Metzler's decisions to

invest in CB&I at the end of, and even after, the proposed class period were prompted by the perceived

risks associated with the disclosed accounting problems. In fact, CB&I's disclosures were part of their

investment strategies. For example, Fortis's Mr. Martin explained that the purchasing Fortis funds had "a

more opportunistic investment strategy" as part of their "tactical" portfolios. *See* Martin Dep. 61:7-17.

Pursuant to this unique strategy, the Fortis funds actually sought out "fallen angels," *see id*. at 61-62,

which included CB&I in light of its accounting problems and burgeoning investigation:

> Q: Would CBI be an example of a fallen angel?
>
> A: Yes. (Martin Dep. 62:17-18)
>
> * * *
>
> Q: Fallen further than what?
>
> A: Fallen further with good reason.
>
> Q: And what was the good reason with respect to CBI, that it announced accounting improprieties?
>
> A: Exactly.
>
> Q: And the ongoing investigation?
>
> A: Yes. (*Id.* at 69:1-7)

This strategy of seeking out high-risk "fallen angels" is hardly surprising considering that Fortis's

prospectuses indicate that the purchasing funds were high-risk funds designed specifically for

"aggressive" investors:

> Q: And in this portfolio, Fortis is telling prospective investors that this portfolio is a class 5 out of 6 possible risk factors, with 6 being the highest, correct?
>
> A: That's correct.
>
> Q: And it's also telling investors that the fund invests aggressively as to be distinguished from the opposite end of the spectrum, which is conservatively, correct?
>
> A: That's correct. (*Id*. at 80:5-14)

Indeed, Fortis's strategy was so focused on its attempt to exploit risk that it continued to invest even after February 3, 2006, *i.e.*, *even after the end of the class period*.  *See* Fortis's April 13, 2006 Certification, Huntley Decl. Ex. F (disclosing that Fortis bought 154,000 shares or 16.3% of its CB&I holdings after February 3, 2006).  Despite Fortis's stunning admission that it failed to make any effort at all to preserve documents related to its own lawsuit, *see* Martin Dep. 40:3 ("We didn't ask for documents to be preserved."), the meager discovery that was available reveals that Fortis's post-class period purchases followed its own analyst's February 6, 2006, exclamation that CB&I had "Trouble in the kitchen!" which, in Fortis's view, counseled in favor of buying *more* shares in the Company. *See* Email from J. Gierveld to R. Stout (Feb. 6, 2006), Huntley Decl., Ex. G.[2]

Just as Fortis aggressively sought out "fallen angels," so too was Metzler aware of the existence of October 2005 accounting problems and the ongoing investigation when it purposefully sought in late January 2006 to invest in CB&I as a "turnaround situation that had some problems in the past." Buchmann Dep. 75:4-5.  Indeed, Metzler did not buy any CB&I stock until January 30, 2006, four days before the end of the proposed class period.  *See* Metzler's April 12, 2006 Certification, Huntley Decl. Ex. H.  And like the post-disclosure, late-purchasing Fortis funds, the Metzler-affiliated funds that invested in CB&I were "high risk" funds, *see id.* at 94:3-4 ("Q:  And is this a high risk fund?  A: Yeah, it's a high risk fund.").  Metzler even warned its own investors that the funds which purchased CB&I were "risky" and recommended investment expertise in "volatile securities":

> Q:  Could you, Ms. Buchmann, read that sentence, read it to yourself.
> Could you tell me what you understood it said?
>
> A:  Yes.  It says that investors in this [Metzler] fund should be aware that
> the fund is risky, and that they could eventually take the risk of losses.
>
> Q:  Does it say something like they should have significant experience
> with regard to the investment in volatile securities?

---

[2]    Fortis's failure to implement a document preservation policy at the beginning of its case not only precluded the production of documents concerning its post-disclosure investment decisions, but its actions were entirely inconsistent with its usual practice of preserving documents related to regulatory inquiries. *See* Martin Dep. 40 (testifying that Fortis preserves documents related to regulatory inquiries but conceding that it did *not* issue a preservation instruction in this litigation).

> A:  Yes.  It says, in the first part of the sentence, that there should be …
> an expertise in volatile investments.  (Buchmann Dep. 94:20-95:8)

Fortis's and Metzler's atypicality and inadequacy come as no surprise.  At the November 7, 2006 hearing on the Defendants' motion to dismiss, when informed of Defendants' concern that Plaintiffs bought late in and even after the end of the proposed class period, the Court admonished that "we have got to have the right class representatives," noting that "it's going to be awfully difficult to have a person represent people who bought during that initial period ….," and suggested that if Plaintiffs had an additional class action plaintiff, they should "put him in [the] complaint now" to avoid needless delay.  *See* Motion to Dismiss Hr'g Tr. 40:8-9; 49:7-13, Nov. 7, 2006, Huntley Decl., Ex. I.  Following the Court's prompting, Plaintiffs' counsel then proffered Mr. Mundy as an additional proposed class representative.  Unlike Fortis and Metzler, however, Mr. Mundy, never purchased CB&I shares after CB&I's October 31 announcement of an ongoing accounting investigation and contemporaneous analyst warnings.  In fact, Mr. Mundy's deposition testimony underscores the chasm between the pre-October purchasers and Fortis and Metzler.  After reviewing the Company's October 31 announcement, Mr. Mundy testified that the disclosure signaled that there could be "numerous" accounting problems at the Company:

> A:  My take is that it could be two or 20 or 2,000 for all I know.
>
> Q:  So there could be numerous problems?
>
> A:  Yeah.  (Mundy Dep. 119:18-21, Feb. 15, 2007)

Even more damning, Mr. Mundy testified that he probably *would not* have invested in CB&I had he known what both Fortis and Metzler knew from CB&I's October 31 announcement:

> Q:  So if this press release had been issued before you purchased the
> company stock, would you have purchased the stock anyway?
>
> Mr. Leviton:  Objection.  We're just speculating again.
>
> A:  Probably not.  (*Id*. at 120:7-13)

Nor would he have invested after analyst appraisals of CB&I, such as that of Sidoti & Co., which warned of "risk beyond that one-time earnings figure":

> Q:  So if you had access to this information before you purchased your stock, would that have affected your investment decision?
>
> Mr. Leviton:  Objection, speculation.
>
> A:  Probably.
>
> Q:  And would you have gone ahead and purchased the stock anyway?
>
> Mr. Leviton:  Objection, speculating.
>
> A:  Would I have?
>
> Q:  Yes.
>
> A:  Probably not.  (Mundy Dep. 124:15-25)

Thus Mr. Mundy's deposition testimony confirms that which was borne out by the deposition testimony of Fortis and Metzler— as post-October, late purchasers who bought knowing the risks of investing in CB&I and its ongoing accounting issues, Fortis and Metzler are subject to serious challenges not present with respect to dissimilar pre-October absent class members or even the post-October class members who did not seek out "fallen angels" or "turnaround situations" or buy (as did Fortis) after the end of the proposed class period.

Further belying any similarity to those purchasers who claim to have been harmed by undisclosed accounting issues, neither Fortis nor Metzler had contemplated pressing securities claims against CB&I until after they were approached by Milberg Weiss:

> Q:  And who brought this lawsuit to [Fortis's] attention?
>
> A:  Milberg Weis.
>
> * * *
>
> Q:  And that was the first time Fortis had considered suing CBI?
>
> A:  Yes.
>
> Q:  Prior to that time, you hadn't considered suing?
>
> A:  We hadn't considered it.  (Martin Dep. 136:1-17)
>
> * * *
>
> Q:  Prior to being contacted by Milberg Weiss, [Metzler] hadn't thought of suing Chicago Bridge & Iron; correct?
>
> A:  Yes, correct, because we did not know anything about the things going on at Chicago Bridge, because in Germany it was not that common to get information about this firm.  (Buchmann Dep. 26:3-9)

**Putative Representatives' Failure to Safeguard Class Interests**

Since lending their name to this action, both Fortis and Metzler have proven themselves to be absentee representatives. Neither Fortis nor Metzler reads all the pleadings in this case. *See* Martin Dep. 110:16-24 (testifying that he reads only those pleadings "put in front of [him]"); *id.* at 114; *see also* Buchmann Dep. 157-58; 163:3-20 (testifying that Metzler relies on Milberg Weiss to forward "important" documents for review). Nor has either negotiated a fee arrangement with their growing cadre of law firms. *See* Martin Dep. at 119-20 (testifying that Fortis has not negotiated a fee arrangement with any of its attorneys); *see also* Buchmann Dep. 135:11-136:5 (testifying that it is important for class representatives to know the fee arrangement with class counsel but conceding that Metzler does not know the fee arrangement here and has chosen not to negotiate a fee arrangement). Indeed, Plaintiffs' counsel has repeatedly refused to produce documents relating to the fee arrangement, despite the relevance of such documents. *See* Letter from Robert M. Roseman to John F. Batter III (Feb. 2, 2007) ("Lead Plaintiffs disagree with your contention that retainer agreements are relevant ...."), Huntley Decl., Ex. J.

Further demonstrating that they choose to put their own interests before those of the class they seek to represent, after existing lead counsel Milberg Weiss was indicted for improperly enticing plaintiffs to file securities fraud actions, both Fortis and Metzler hired counsel to safeguard their own interests but chose to leave the rest of the class to be represented by Milberg Weiss. *See* Martin Dep. 140-42 (testifying that Fortis did *not* petition for the removal of Milberg Weiss as co-class counsel despite testifying that "it was, in [Fortis's] belief, not in the best interests of the class for Milberg Weiss to act for the class")ʼ, *see also* Buchmann Dep. 13:4-24 (testifying that Metzler retained Motley Rice LLP for itself and only itself, "not with respect to the class, but just for individual reasons for Metzler;" and conceding that despite its attempt to be a certified class representative, Metzler does not even know if Motley Rice represents the class). In fact, at the beginning of Fortis's deposition, Fortis's replacement counsel, Mr. Roseman, expressly chose to distance Fortis from the class, stating "I just want to note for the record that Mr. Weprin [of Milberg Weiss] is *not* here as a representative of the witness or for Fortis Investments." Martin Dep. 6:7-9 (emphasis added).

Exacerbating the lack of any fee arrangement, neither Fortis nor Metzler sees fit to act on behalf of the class to monitor expenses among their numerous law firms. *See* Martin Dep. 130:9-131:24 (testifying that Fortis will not monitor expenses until settlement, if there is one); *see also* Buchmann Dep. 145:16-146:19 (testifying that in Metzler's view, it is not part of its job to monitor expenses). In fact, despite being a "multi-billion dollar investment fund," Pls.' Mot. at 10, Metzler did not even pay for its own Rule 30(b)(6) designee to travel from Germany to New York for her deposition. Instead, Milberg Weiss paid the travel costs for Ms. Buchmann. *See* Buchmann Dep. 136:13-20.

With the late arrival of Mr. Mundy, the class fares no better since he too has abdicated his responsibilities to the class and ceded all control to counsel. Like Fortis and Metzler, he has not negotiated any fee arrangement with counsel. *See*, *e.g.*, Mundy Dep. 148:13-15. In addition, Mr. Mundy—who admits he has dedicated only "a few minutes here, a few minutes there" to this litigation, *see id*. at 27:11-15—has failed to monitor the litigation and possesses scant knowledge of the case and its filings, choosing to allow counsel to act unilaterally. For example, prior to his deposition, Mr. Mundy had never seen the responses and objections to Defendants' interrogatories and document requests filed in his own name. *See id*. at 168:25 (stating "I have not seen this" when asked if familiar with his own objections and responses to Defendants' first request for production of documents); *id.* at 177:17-19 ("Q: Have you ever seen this document [Walter J. Mundy's objections and responses to Defendants' first set of interrogatories]? A: No.").

Similarly reflecting his meager knowledge of both the case and the current certification proceedings, Mr. Mundy also testified that he does not know what class certification is, *see* Mundy Dep. 31:11-19; does not know whether this action is in state or federal court, *see id.* at 20:8-12; and mistakenly believes the action seeks "punitive damages," *see id.* at 47:9-12. What little he did know during his deposition he read largely from a note card that he brought with him, which provided him with basic information such as the class period, the identity of lead plaintiffs, the identity of lead counsel, the status of the case at the certification stage, and the dates he purchased CB&I stock. *See* Mundy Dep. 21:11-22:7

("Q:  Okay.  And I see you have a note card there that you're reading from.  Does that note card say anything else?  A:  Yes …); *see also* Mundy Note card from Feb. 15, 2007 Dep., Huntley Decl. Ex. K. [3]

**ARGUMENT**

**ALL THREE PROPOSED REPRESENTATIVES ARE ATYPICAL OF THE POST-OCTOBER PURCHASERS, AND THEY ARE ALL INADEQUATE AS TO THE ENTIRE CLASS**

### I.    Plaintiffs' Burden Under Rule 23

Federal Rule of Civil Procedure 23(a) requires that a class representative be "typical" of the class and that a representative "fairly and adequately" protect the interests of the class.  Fed. R. Civ. P. 23(a); *see also Miles v. Merrill Lynch, et al. (In re Initial Public Offering Sec. Litig.)*, 471 F.3d 24, 32 (2d Cir. 2006) (citing Fed. R. Civ. P. 23).  In addition, when seeking to certify a class pursuant to Rule 23(b)(3), a putative representative must demonstrate, among other things, that questions of law and fact common to all class members predominate over questions affecting individual members.  *See id.*

The party moving to certify a proposed class bears the burden of establishing that it meets these Rule 23 requirements, and a court may certify a proposed class only after assessing "all the relevant evidence admitted at the class certification stage," and finding that "each of the Rule 23 requirements has been met."  *Id*. at 42.  Furthermore,

> such determinations can be made only if the [court] resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met.

*Id.* at 41.  A court's "obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue"—even where the two are "identical."  *Id.*  "A court that is not satisfied

---

[3]    Mr. Mundy's lack of knowledge regarding the case is not surprising considering he had no involvement in preparing the Complaint and has never read any of the materials cited in it.  *See* Mundy Dep. 84:3-12 (no involvement in preparing complaint); *id*. at 85:18-24 ("Q: [A]fter you read the complaint, did you then review any of the records that are referenced in the complaint?  A:  No; Q:  Have you ever reviewed any of those documents?  A:  Nope.").

- 11 -

that the requirements of Rule 23 are met should refuse certification until they have been met." Fed. R.

Civ. P. 23 Advisory Committee Note (2003 Amendment, Subdivision (c)(1)).[4]

## II.    The Proposed Class Representatives are Atypical

### A.    Fortis and Metzler Are Atypical on Account of Their Knowledge of the Risks of the Disclosed Accounting Improprieties and Their Highly Speculative Trading Strategies

A claim is atypical "where the putative class representative is subject to unique defenses which

threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222

F.3d 52, 59 (2d Cir. 2000) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)). A court should deny certification when it determines there

is "danger that absent class members will suffer if their representative is preoccupied with defenses

unique to [it]." *Id.* at 60. Even when no one facet renders a proposed representative atypical, the sum of

several factors can render it atypical and inadequate. *See id.* (affirming district court's decision that

proposed representative was atypical and inadequate due to timing and circumstances of investment

combined with investment strategy, even though "no one facet" standing alone destroyed typicality).

Here, Fortis is atypical because, among other things, it continued to purchase CB&I stock even

*after* the proposed class period ended on February 3, 2006, and thus after the time when even Plaintiffs

claim the market learned of the alleged fraud. On numerous occasions, this court and others have held

that such post-class period purchasers are precluded from serving as class representative on account of the

unique defenses to which they become subject. *See Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 69

(S.D.N.Y. 2000) (Sprizzo, J.) ("[A] person that increases his holdings after revelation of an alleged fraud

involving that security is subject to a unique defense that precludes him from serving as a class

---

[4]    At the outset the Court should exclude all CB&I investors who sold *before* the October 26, 2005 press release, as these investors, as a matter of law, cannot prove loss causation under the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005), because they cannot be said to have suffered any loss caused by the alleged misrepresentations. *See Dura*, 544 U.S. at 343 ("But if, say, the purchaser sells the shares quickly *before* the relevant leak out truth begins to leak out, the misrepresentation *will not have led to any loss.*") (emphasis added); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, No. 03-2522, 2006 WL 1180267, at *8 (N.D. Cal. May 3, 2006) (excluding from class under *Dura* all who sold before first disclosure since these investors, as a matter of law, failed to allege a loss causally related to alleged misrepresentations).

representative."); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992) (Sprizzo, J.) (denying class

certification on ground that plaintiffs' purchases after "truth" allegedly revealed subjected them to unique

defenses concerning reliance and materiality, and thus rendered them atypical and inadequate); *Gary*

*Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 119 F.R.D. 344, 348-49

(S.D.N.Y. 1988) (putative class representative whose purchases continued after it learned of alleged fraud

was subject to unique defenses of lack of materiality, lack of reliance, waiver and estoppel), *aff'd* 903

F.2d 176 (2d Cir. 1990).[5]

      Moreover, not only was Fortis aware of the accounting problems when it made its post-class

period purchases, but it decided to invest in CB&I precisely because of the accounting problems.

Notably, among the few relevant documents preserved and produced by Fortis is an internal February 6,

2006 e-mail with the subject line "CBI [down] 30%!!!" which exclaimed "Trouble in the kitchen!" and

which prompted Fortis to purchase *more* shares.  *See* Huntley Decl., Ex. G.  This fact alone raises serious

doubts and subjects Fortis to challenges regarding materiality and reliance.  Indeed, Fortis's late and post

class period investments were made only after the Fortis high-risk funds designed for "aggressive"

investors, *see* Martin Dep. 80, determined CB&I was a "fallen angel" on account of its disclosed

accounting problems and burgeoning investigation.  *See id*. at 62:17-18 ("Q:  Would CBI be an example

of a fallen angel?  A:  Yes."); *id.* at 69 (explaining that the disclosed accounting improprieties and

investigation lead Fortis to classify CB&I as a "fallen angel").

      Furthermore, unlike the majority of the class members it seeks to represent, Fortis was also

"invited" to an investor conference hosted by Bear Stearns on which Fortis conceded it relied in its

decision to invest in CB&I.  *See* Martin Dep. 13:18-21 ("He made the investment decision following a

---

[5] *See also Koenig v. E.M. Benson*, 117 F.R.D. 330, 336 (E.D.N.Y. 1987) ("Since he nonetheless
purchased more stock after the bankruptcy, his behavior raises doubts about the importance to him of the
purported omissions in Mission's reports . . . . Accordingly, [the proposed representative] is subject to
unique defenses which make him an atypical plaintiff . . . ."); *In re Safeguard Scientifics*, 216 F.R.D. 577,
582 (E.D. Pa. 2003) (denying class certification, in part, because proposed representative increased his
holdings in defendant's stock after public disclosure of alleged fraud, raising serious doubts as to
materiality and reliance); *Rolex Employees Ret. Trust v. Mentor Graphics Corp*., 136 F.R.D. 658, 664 (D.
Ore. 1991) (same); *Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *3 (N.D. Ill., April
21, 1988) (same).

presentation by Bear Stearns in December 2005, at which there were a number of other companies presented."). Fortis's reliance on information available to only select investors further erodes its typicality. *See Baffa*, 222 F.3d at 59-60 (excluding putative representative because, in addition to buying after the share price declined amidst reports of financial difficulty, she had access to information unavailable to others).[6]

The same rationale that precludes the required finding that Fortis is "typical" on account of its post-class period purchases also bars Metzler from establishing typicality. Like Fortis, Metzler purchased only after the October 31, 2005 announcement and associated analyst warnings. In fact, Metzler's Ms. Buchmann conceded that Metzler and other post-October purchasers were aware of the accounting improprieties at CB&I. *See* Buchmann Dep. 220:19-25 ("Q: So you and other people in the market after October 31 knew that [CB&I] had accounting problems with costs and claims, correct? A: Correct.")

Accordingly, Metzler is not similarly situated with, and cannot be included in, a class whose claim is that they purchased CB&I shares *without knowing* of accounting problems at CB&I. *See id*. at 221:4-6 ("Q: So they [post-October 31 purchasers] are different? A: Yes, in the form of that information, they are different."). Moreover, as of October 31, 2005, the market was replete with analyst reports warning investors that there was increased "risk" of a greater earnings charge based on "broader" accounting problems. *See, e.g.*, Sidoti & Co. Oct. 31, 2005 Report, Huntley Decl., Ex. D (warning "there is risk beyond that one-time earnings figure"); D.A. Davidson & Co. Oct. 31, 2005 Report, Huntley Decl., Ex. E (warning that "the risk of broader accounting improprieties is increased"). As Metzler's Ms.

---

[6] No doubt aware of the impediments to demonstrating typicality in light of its post-class period purchases and unique trading strategy, Fortis's counsel asked only one question at the deposition of Mr. Martin, apparently in an effort to establish that Fortis was merely "averaging down." Martin Dep. 189. But as *Kline v. Wolf* instructs, speculative trading that evidences a lack of reliance on the integrity of the market price renders a proposed representative atypical. *See* 88 F.R.D. 696, 699 (S.D.N.Y. 1981) (declining to certify proposed representative because, *inter alia*, representative believed that the drop in the stock price was due to profit taking and that subsequent purchases were made in order to average down the per share value of his stock, indicating that plaintiff "was a speculative trader in the [company's] stock and that his purchases and sales did not depend upon either the financial statement or the market's reaction thereto"), *aff'd in relevant part, rev'd in part on other grounds*, 702 F.2d 400 (2d Cir. 1983). If anything, Fortis's investments in a "fallen angel" that disclosed accounting problems and an ongoing investigation exceeds the speculative nature of the purchases that destroyed typicality in *Klein*, particularly when Fortis chose to invest even after its analyst exclaimed: "CBI [down] 30%!!!" and "Trouble in the Kitchen!" *See* Huntley Decl., Ex. G.

Buchmann testified, like Fortis (*see* Martin Dep. 24), Metzler consulted such analyst reports before investing in CB&I.  *See* Buchmann Dep. 263:24-25 (testifying that Metzler "reviewed lots of information," including analyst reports and press releases, prior to buying CB&I stock).

　　　　More important, as with Fortis's "tactical portfolio" that sought out "fallen angels," Metzler's Ms. Buchmann conceded that its purchasing funds viewed CB&I as "a turnaround situation" well suited to its high-risk funds designed for those with experience in "volatile" securities.  *See* Buchmann Dep. 75:7-12 (explaining perception of CB&I as "turnaround" with past "problems"); *id.* at 94:3-4 (conceding the investing funds were "high risk"); *id.* at 94:22-95:8 (explaining that Metzler prospectus for the investing funds recommended "expertise in volatile securities").  Indeed, Metzler did not even buy CB&I shares until four days before the end of the proposed class period.  Clearly, Metzler and Fortis, unlike other class members, knew of the disclosed accounting problems and the associated risks and nonetheless invested because of them.

　　　　Contrary to Plaintiffs' suggestion, this is not a case like *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp 2d 277, 281 (S.D.N.Y. 2002), which merely involved "minor variations" among class members.  *See* Pls. Mem. of Law at 13.  Rather, this is a case in which Fortis and Metzler (i) knew of certain disclosed accounting improprieties at CB&I, (ii) knew of an ongoing company-wide investigation into accounting practices, (iii) knew that CB&I was not able to predict the outcome of the investigation until it was completed, (iv) knew of analyst warnings that the investigation could lead to "broader" issues, and yet nonetheless invested in CB&I *because of* the known accounting issues and associated risks which were consistent with investment strategies of their high-risk funds which sought "fallen angels" and "turnaround situations."  If any case posed the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it," it is this case.  *See Baffa*, 222 F.3d at 60 (affirming rejection of putative representative as atypical because she was a professional broker who, like Fortis and Metzler, bought after the stock had declined amidst reports of financial difficulty).

　　　　Finally, even if any one of the above factors standing alone were insufficient to preclude them from serving as class representative, viewed together they render atypical the claims of both Fortis and

Metzler. *See Baffa*, 22 F.3d at 59-60.  In *Baffa*, the district court rejected a proposed class representative on grounds that her claims were atypical since she was a sophisticated broker with access to more information than other investors and because she bought defendant's stock after the value had drastically declined amidst reports of financial difficulty.  *Id.* at 59.  The Second Circuit affirmed the district court's decision regarding the absence of typicality, concluding that "while perhaps no one facet of [appellant's] claim renders it atypical, her status as a professional broker and the defenses to which she is subject convince us that it was within the district court's discretion to reject her as a class representative."  *Id.* at 60.  If anything, the atypicality of Fortis's and Metzler's claims is more pronounced than the claims deemed atypical in *Baffa.*

**B.    By His Own Admission, Mr. Mundy is Clearly Atypical of the Post-October 31 Purchasers**

Mr. Mundy's deposition testimony not only confirms the atypicality of Fortis and Metzler, but it further demonstrates that Mr. Mundy's claims are atypical of those who purchased after CB&I's October announcements and the subsequent analyst warnings.  *See*, *e.g.*, *In re Safeguard Scientifics*, 216 F.R.D. at 583 (declining to certify putative representative whose deposition testimony undermined the class's case with respect to materiality and reliance such that the testimony "adversely impact[ed] the interests of the proposed class").  In particular, as Mr. Mundy himself explained, he "probably" would not have bought shares in CB&I after the Company's October 31, 2005 press release in light of the disclosure of "accounting improprieties" and an ongoing investigation.  *See* Mundy Dep. 120:7-13 ("Q:  So if this press release [Oct. 31, 2005 release] had been issued before you purchased the company stock, would you have purchased the stock anyway?  A:  Probably not.); *id.* at 121 (conceding that purchasing after the October 31, 2005 press release would not be reasonable to him, although it might be to others).  Similarly, Mundy "probably" would not have purchased after publications of Wall Street analyst reports recommending against buying CB&I stock, such as the October 31, 2005 Sidoti & Co. Analyst Report that warned of further risks to CB&I's earnings on account of the "improprieties" disclosed.  *See id.* at 124:15-25 ("Q: So if you had access to this information [Oct. 31, 2005 Sidoti Report] before you purchased your stock,

- 16 -

would that have affected your investment decision?  A:  Probably.  Q:  And would you have gone ahead and purchased the stock anyway?  A:  Would I have?  Q:  Yes.  A:  Probably not.").  According to Mr. Mundy, the Company's disclosures that it had commenced an independent investigation that could be time consuming meant that the accounting issues could be numerous.  *See id.* at 119:18-19 ("My take is that it could be two or 20 or 2,000 for all I know.").

Thus, because Fortis and Metzler are atypical of both unknowing pre-October purchasers and post-October purchasers given their unique investment strategies, they cannot be certified as class representatives.  Nor can Mundy represent post-October purchasers having testified that he would not have invested when they did in light of CB&I's October disclosures and subsequent analyst warnings.  Accordingly, no class can be certified after October 31, 2005, due to the lack of a typical representative (a result mandated separate and apart from the proposed representatives' fatal inadequacy described below).  *See, e.g., Kovalef*, 142 F.R.D. at 408 (holding that putative representative was not capable of satisfying Rule 23 and declining to certify class, notwithstanding absence of another representative for proposed class).[7]

### III.    No Class Can Be Certified Because All The Proposed Class Representatives Are Inadequate

#### A.    Fortis and Metzler Are Inadequate on Account of Their Failure to Monitor the Litigation and Their Blind Reliance Upon Counsel

"Rule 23(a)(4) requires that the party is not simply lending his name to a suit controlled entirely by the class attorney." *Beck v. Status Game Corp.*, No. 89-Civ.-2923, 1995 WL 422067, at *4-5 (S.D.N.Y. July 14, 1995) (finding proposed class representative inadequate because of lack of familiarity with the suit and lack of control exercised over attorneys).  To this end, Congress enacted the PSLRA to address perceived abuses in securities fraud class actions created by lawyer-driven litigation.  *See* H.R.

---

[7] Having failed to satisfy Rule 23(a), Plaintiffs fail as a matter of law to meet "the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *See Amchem Prods. v. Windsor*, 521 U.S. 591, 610 (1997).  Where "individualized issues of fact abound," as they do here in light of the timing, circumstances and unique strategies underlying Fortis's and Metzler's investments, courts must deny certification. *See, e.g.*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255-56 (2d Cir. 2002); *see also In re IPO Sec. Litig.*, 471 F.3d at 45 (vacating class certification in securities action because the predominance of individual issues regarding reliance contravened Rule 23(b)(3)'s predominance requirement).

Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 689; *see also Ferrari v. Impath, Inc.*, 03-civ- 5667, 2004 WL 1637053, at *3 (S.D.N.Y. July 20, 2004). The Reform Act's purpose was "to empower investors so that they – not their lawyers – exercise *primary* control over private securities litigation." *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004) (citation omitted). Here, however, we have just the opposite— lawyers seeking out institutional clients to lend their names to a lawsuit in which the clients negotiate no fees, monitor no expenses, preserve no documents (in the case of Fortis) and read only what their attorneys select for them to review. Such an arrangement hardly satisfies the post-PSLRA, congressionally required "primary control."[8]

Where, as here, the proposed class representative has turned over the prosecution and monitoring of their case to counsel, certification must be denied. *See*, *e.g.*, *Scott v. New York City Dist. Council of Carpenters' Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004) ("An essential element of adequacy of representation is that the class representative be sufficiently familiar with the case as to exercise *independent control over the attorney*") (emphasis added). In particular, it is incumbent upon the class representative "to be alert for, and to report to the court, any conflict of interest on the part of class counsel, as for example, counsel's greater concern for receiving a fee than for pursuing the class claims." *Id.* at 357 (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995)). To this end, "one of the best ways for a court to ensure that [lead plaintiff] will fairly and adequately represent the interests of the class" is to inquire whether the movant has demonstrated a willingness and ability "to negotiate a reasonable retainer agreement" with counsel. *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001); *see also Epstein v. Am. Reserve Corp.*, No. 79-c-4767, 1985 WL 2598, at

---

[8] Plaintiffs' claim that the Court's May 11, 2006 Order appointing Fortis and Metzler as Lead Plaintiffs "already determined . . . that they are capable of adequately representing the interests of the class," Pls.' Mem. of Law at 10, is incorrect. The statute Plaintiffs cite, 15 U.S.C. § 78u-4(a)(3)(B)(i), governs appointment of "lead plaintiff," which requires a less onerous showing than is needed for class certification. *See Linn v. Allied Ir. Banks, PLC*, 02-civ-1738, 2004 U.S. Dist. LEXIS 24655, at *13 (S.D.N.Y. Dec. 8, 2004) (holding that the Rule 23 inquiry under 15 U.S.C. § 78u-4(a)(3)(B) "is less stringent than the rule otherwise requires"); *Weinberg v. Atlas Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003) ("a wide-ranging analysis under Rule 23 is not appropriate [at initial stage] and should be left for consideration of a motion for class certification"). Further, the designation as "lead plaintiff" in no way prejudices Defendants from contesting the adequacy of Fortis and Metzler. *Koppel v. 4987 Corp.*, 1999 U.S. Dist. LEXIS 12340 (S.D.N.Y. Aug. 9, 1999) (appointment as lead plaintiff "does not prejudice defendants' capacity to contest plaintiff's adequacy on a motion for class certification").

*3 (N.D. Ill. Sept. 18, 1985) ("Fee arrangements are relevant to the ability of named plaintiffs to protect the interest of potential class members . . . ").

Here, however, neither Fortis nor Metzler has negotiated a fee arrangement with counsel.  Nor has either made any attempt to monitor expenses.  *See* Martin Dep. 119:6-8 ("Q:  Okay, do you know how much they're going to be paid after settlement?  A:  No."); *id.* at 131:2-3 (conceding that Fortis will not review expenses before settlement); Buchmann Dep. 135:11-136:3 (testifying that Metzler has chosen not to negotiate a fee arrangement); *id.* at 145:16-146:8 (testifying that, in Metzler's view, it is not its job to monitor expenses).  Ms. Buchmann even conceded that the fee arrangement "is important because due to that percentage . . . the class members get more or less compensation," which is why representatives in other cases negotiate fees.  *See* Buchmann Dep. 135:11-136:3.  Yet Metzler still chose not to negotiate one. *Id.*[9]

Courts have also long recognized that a class is entitled to more than blind reliance upon even competent counsel.  *Greenspan v. Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y. 1978) (citation omitted).  The blind reliance of Fortis and Metzler first manifested itself when they conceded that they had not even considered suing CB&I until induced to do so by Milberg Weiss.  *See* Martin Dep. 136:1-14; Buchmann Dep. 26:3-15.  It is further demonstrated by their lack of familiarity with the pleadings in this case.  Rather than take an appropriately active role in the litigation, Fortis's Mr. Martin admitted that he merely reads what is "put in front of [him]."  Martin Dep. 110:16-21.  In the case of Metzler, Ms. Buchamann testified that she does not read every filing but instead relies on Milberg Weiss to provide her with any

---

[9] While Fortis and Metzler expressly disclaim that they negotiated class attorneys' fees, Plaintiffs' counsel has refused several requests to produce documents related to fee arrangements.  *Compare* Roseman Feb. 2, 2007 Letter, Huntley Decl., Ex. J ("Lead Plaintiffs disagree with your contention that retainer agreements are relevant ….") *with Ferraro v. Gen. Motors Corp.*, 105 F.R.D. 429, 433 (D.N.J. 1984) (granting motion to compel; "[T]he fee agreement itself is discoverable …. This agreement … is highly relevant to the issue of adequate representation."); *Epstein*, 1985 WL 2598, at *3 (explaining that the fee arrangement is relevant to question of adequacy under Rule 23).  <u>Yet, if there is no attorneys fee agreement (as both Fortis and Metzler testified), why will Plaintiffs' counsel not simply say as much?</u>  If, on the other hand, there is an as-yet undisclosed attorneys' fee agreement, <u>the fact that neither Fortis nor Metzler is aware of it, only underscores their inadequacy.</u>  The fee arrangement, if any, is of greater relevance in this matter in light of Fortis's and Metzler's monitoring agreements with Milberg Weiss, pursuant to which Milberg Weiss undertook fund monitoring at its own expense, *see* Martin Dep. 136:22-137:20 (describing monitoring agreement); Buchmann Depo. at 144 (same), thus raising the question whether counsel has negotiated a premium in this litigation to recover for its services under the parties' pre-existing monitoring agreements.

"important" documents, Buchmann Dep. 157:10-158:17; and yet, she had no idea why co-lead plaintiff Fortis replaced Milberg Weiss and, in fact, could not recall ever seeing Fortis's petition to substitute counsel because of its concerns following the indictment of Milberg Weiss. *See id.* at 163:12-13 ("Q: You don't remember ever seeing this?  A:  No.").

The tendency of Fortis and Metzler to act in their own self-interest to the detriment of the absent class members is also apparent in their choice to select their own individual replacement counsel without seeking to replace Milberg Weiss for the class.  For its part, Fortis sought to replace Milberg Weiss as its own counsel with not one, but two, law firms— Cohen, Milstein, Hausfeld & Toll, P.L.L.C and Spector, Roseman & Kodroff, P.C.— after Fortis determined that it was "not in the best interests of the class for Milberg Weiss to act for the class," Martin Dep. 141:19-21.  Despite this determination, Fortis never bothered to petition the Court to eliminate Milberg Weiss from the job for which Fortis deemed that firm unfit.  *See id.* at 141:4-7 ("Q: And what role, if any, did you expect for Milberg to have after that request to the court, with respect to the class?  A:  That was a decision for the court to take.").  Indeed, Fortis apparently believes Milberg can remain as class counsel even though it was made very clear that Milberg Weiss no longer represents Fortis.  *Id.* at 6:7-9 ("I just want to note for the record that Mr. Weprin [of Milberg Weiss] is *not here as a representative of the witness or for Fortis Investments.*") (emphasis added).  Such actions undercut any claim that Fortis is an adequate fiduciary acting to safeguard the interests of the absent class members whom it has left in the hands of a law firm it deems unsuitable.

Similarly, Metzler retained Motley Rice to protect its own interests after concerns regarding Milberg Weiss's indictment, *see* Buchman Dep. 15:15-24, without seeking to have Motley Rice represent the class.  *See id.* at 13:4-9 ("Q:  Has Motley Rice joined Milberg with respect to the class?  A:  No, not with respect to the class, but just for individual reasons for Metzler."); 14 ("Q:  Do you know whether you or anyone else has asked that Motley Rice be asked to represent the class in this action?  A:  We have made – I am not quite sure because we made an agreement with Motley Rice that they represent us in this case, but I am not sure that that means that they also represent the class in this case.").

**Fortis's Failure to Preserve Relevant Documents**

Fortis's inadequacy is made worse by its admitted failure to preserve documents related to this litigation. As Mr. Martin conceded, while Fortis knows well its obligation to preserve documents related to regulatory investigations, *see* Martin Dep. 38:5-25, it "didn't ask for documents to be preserved" in this case. *See id.* at 38-40. This discovery violation alone renders Fortis inadequate. *See McDaniel v. County of Schenectady*, No. 04-cv-757, 2005 U.S. Dist. LEXIS 14852, at *10 (N.D.N.Y. July 21, 2005) (holding that failure to comply with reasonable discovery obligations "strongly intimates that the class representation is inadequate"); *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976) ("One who will not comply wholeheartedly and fully with the discovery requirements of modern federal practice is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted.").

**Metzler's Lack of Standing and False Certification**

Metzler's inadequacy is compounded by its lack of standing to sue on behalf of two of the four Metzler funds that purchased CBI stock, notwithstanding its sworn Certification to the Court prepared by Milberg Weiss, *see* Buchmann Dep. 38:18-25, representing that it is "duly authorized to institute" legal action on behalf of all four purchasing funds, including the two funds *not* administered by Metzler. *See* Huntley Decl. Ex. H. Those two funds are instead administered by Metzler Ireland, an entirely separate company that is not a plaintiff in this action. *See Id.* at 43:18-44:22 (explaining that Metzler Ireland—and not Metzler—administers the Metzler Ireland funds). According to Ms. Buchmann, the only basis Metzler had to assert under oath that it was authorized to bring an action on behalf of the two Metzler Ireland funds, MIL Fund 557 and MIL Fund 570, is a power-of-attorney obtained from Metzler Ireland. *See generally* Buchmann Dep. 43-50; *see also id.* at 44:5-13 (explaining that it is Metzler Ireland that holds the power to sue on behalf of the two Metzler Ireland funds but that, in Metzler's view, Metzler Ireland "gave [Metzler] power of attorney to do so for Metzler Ireland"). However, the actual terms of the power-of-attorney relied upon by Metzler *do not* authorize Metzler to initiate litigation or otherwise mention instituting litigation on behalf of the two Metzler Ireland funds. Instead it expressly *limits*

Metzler's authority to merely executing "Proof of Claim forms *in any settlement*," and other matters

relating to "*Settlement*," as that term is narrowly defined in the instrument.  *See* "General Power of

Attorney (Class Actions)" (emphasis added), Huntley Decl., Ex. L.[10]

      Metzler's lack of candor with the Court in its representations concerning its standing to sue for

two of the four funds is alone sufficient to establish its inadequacy.  *See Kline v. Wolf*, 702 F.2d 400, 403

(2d Cir. 1983) (affirming district court's decision that "preliminary finding" that putative representative's

"credibility [is] vulnerable to attack" is sufficient to deny class certification); *Zemel Family Trust v.

Philips Int'l Realty Corp.*, 205 F.R.D. 434, 437 (S.D.N.Y. 2002) (plaintiff's "lack of honesty and

trustworthiness . . . shows that he does not meet the standards of a fiduciary who will fairly and

adequately protect the interests of the class").  Moreover, Metzler's inaccurate certification in this case is

not the first incorrect sworn certification prepared by Milberg Weiss and submitted by Metzler.  *See

generally* Buchmann Dep. 195-206 (conceding that *Metzler has filed incorrect certifications* prepared by

Milberg Weiss *in three other securities class actions* since 2002).  Courts have routinely rejected putative

class representatives as inadequate where they verified the accuracy of inaccurate documents.  *See, e.g.,

Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225, 232 (S.D. Ind. 2006) (finding plaintiffs

inadequate where, "rather than taking the time to consult with [plaintiff] and review the important

documents with him . . . [the Court] surmise[s] that counsel simply mailed these forms to [him] with

instructions to sign them which he did").  Indeed, such false certifications have been deemed sufficient in

a recent case to reject Milberg Weiss as lead counsel.  *See, e.g., In re Organogenesis Sec. Litig.*, No. 04-

cv-10027, 2007 U.S. Dist. LEXIS 18795, at *48 (D. Mass. March 15, 2007) (concluding that Milberg

---

[10] Even if the power of attorney did authorize Metzler to institute litigation on behalf of the two Metzler Ireland funds (and it does not), the Second Circuit has held that a power-of-attorney, unaccompanied (as here) by any transfer of the claim itself, fails to confer standing.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (2d Cir. 1997); *see also Connecticut v. Phys. Health Servs. of Conn., Inc.*, 287 F.3d 110, 117 (2d Cir. 2002) ("[A] valid and binding assignment of a claim (or portion thereof)—not only the right or ability to bring suit—may confer standing on the assignee."); *LaSala v. Needham & Co.*, No. 04-Civ. 9237, 2006 WL 452024, at *4 (S.D.N.Y. Feb. 24, 2006) (holding that a "valid assignment of a claim must transfer not just the authority to initiate a lawsuit, but also an actual interest in the outcome.").

Weiss was inadequate lead counsel because, among other things, Milberg Weiss failed to oversee putative

representative's erroneous certification).

**B.    Mr. Mundy Is Inadequate Because He Also Has Failed to Monitor the Litigation and Possesses Very Little Knowledge of the Case**

Like Fortis and Metzler, Mr. Mundy is also an inadequate representative. His failure to monitor

the litigation is amply demonstrated by the fact that he had never seen his own objections and responses

to the Defendants' document requests and interrogatories prior to his deposition. *See* Mundy Dep.

168:12-25 (stating "I have not seen this" when asked if familiar with his own objections and responses to

Defendants' first request for production of documents); *id.* at 177:17-19 (same with regard to his

interrogatory answers). In fact, he could not recall ever seeing any pleadings indicating that he is a

plaintiff. *See id.* at 19:10-12. At his deposition Mr. Mundy also conceded that he has only spent "a few

minutes here, a few minutes there" monitoring the case. *See id.* at 27:11-13 ("Q: But generally it's a few

minutes here, a few minutes there, that sort of thing, the pattern? A: Yeah."). The adequacy requirement

demands more. *See* Darvin v. Int'l Harvester Co., 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (Sprizzo, J.)

(putative representative inadequate where, *inter alia*, representative's personal knowledge of the facts

pleaded in the complaint were "extremely limited or nonexistent").

In particular, courts have found that proposed class representatives, like Mr. Mundy, are

inadequate on account of their lack of knowledge of the suit when they do not know the allegations in the

complaint, have no idea how many people are in the class, and are unable to participate in the case

because of restrictions on traveling. See Scott, 224 F.R.D. at 356-57; see also Beck, 1995 WL 422067, at

*4-5. Here, Mr. Mundy's testimony more than demonstrates his inadequacy: he does not know what

class certification is, *see* Mundy Dep. 31:11-19; he does not know whether the action is in state or federal

court, *see id.* at 20:8-12; he mistakenly believes the action seeks "punitive damages," *see id.* at 47:9-12;

he "presumes" that "the extent of [his] participation" would be to testify as a deponent and possibly "in

front of a judge," *id.* at 47:18-25, and he made clear that his ability to travel to New York for the litigation

is limited by, among other things, his "other commitments" such as museum board meetings, *id.* at 36.

Indeed, it is doubtful that Mundy would have had *any* knowledge of the case absent the note card he brought into his deposition and upon which he relied in order to provide answers regarding the class period, the identity of lead plaintiffs, and the identity of lead counsel. *See id.* at 21:11-22:7; *see also* Mundy Note card from Feb. 15, 2007 Dep., Huntley Decl. Ex. K.

Finally, like Metzler, Mr. Mundy also filed an incorrect Certification in this matter, misrepresenting his transactions in CB&I by including incorrect dates for his transactions. *See* Mundy Dep. 62:12 ("A: We decided to modify [the Certification] to correct it."). As with Metzler, Mr. Mundy's incorrect certification further renders him inadequate. *See*, *e.g.*, *In re Sonus Networks*, *Inc. Sec. Litig.*, 229 F.R.D. 339, 343 (D. Mass. 2005) (concluding that plaintiff who attested under oath that his schedule of transactions was accurate and complete when in fact it was not attached to his affidavit, "as a person who would verify the accuracy of an incomplete document, was not an appropriate class representative."); *see also In re Safeguard Scientifics, Inc.*, 216 F.R.D. at 582 & n.4 (finding putative lead plaintiff inadequate where his certification raised concerns about credibility).[11]

Compounding their individual inadequacies, all putative class representatives have failed to communicate or otherwise work collectively to exercise control over this litigation. *See* Martin Dep. 121:22-24 ("Q: Have you ever discussed this case with anyone who works at Metzler? A: No."); Buchmann Dep. 17:10-12 (conceding that Metzler has no knowledge of why Fortis fired Milberg Weiss); Mundy Dep. 52:6-25 ("Q: Have you made any attempt to coordinate this litigation with Metzler? A: No. … Q: Okay and you've made no attempt to coordinate the litigation with Fortis. A: No, no."). The absence of such communication is at odds with the Reform Act, pursuant to which the mettle of a group of lead plaintiffs is in part determined, as the Securities and Exchange Commission has urged, by whether they can "function collectively." *In re Network Assoc., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1026 (N.D. Cal. 1999) (citing Amicus Brief of the SEC in *Parnes, et al. v. Digital Lightwave, Inc.*, at 12, 15, No. 99-

---

[11] In addition, like Fortis and Metzler, Mr. Mundy has no knowledge of any fee arrangement with counsel, *see id.* at 146:6-23, and he has "absolutely not" negotiated any fee arrangement, *id.* at 148, 149-150. *Cf. In re Cendant Corp. Sec. Litig.*, 264 F.3d at 265 (holding that "one of the best ways for a court to ensure that [lead plaintiff] will fairly and adequately represent the interests of the class" is to inquire whether the movant has demonstrated a willingness and ability "to negotiate a reasonable retainer agreement").

11293 (11th Cir. Aug. 25, 1999)).  Indeed, during a period of considerable activity in this case (ruling on motions to dismiss, discovery regarding class certification, termination of Milberg Weiss by Fortis, retention of separate counsel by both Fortis and Metzler, and the last-minute addition of Mr. Mundy), Fortis, Metzler and Mr. Mundy have not communicated with each other or otherwise demonstrated that they can function collectively or "operate in concert and manage the litigation and the lawyers." *Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*, 354 F. Supp. 2d 18, 24 (D. Mass. 2000).  Instead, they have improperly delegated the entire case— pleadings, fees, strategy, hiring and firing of attorneys, even preparation of sworn (but erroneous) certifications— to the now *four* different law firms who have appeared in this case.  Accordingly, each fails to satisfy Rule 23(a)(4)'s requirement of adequacy.

## CONCLUSION

Because none of the putative representatives are typical of post-October purchasers and because all three are inadequate representatives for any class, the Court should deny Plaintiffs' motion for class certification.

Respectfully submitted,

CHICAGO BRIDGE & IRON CO. N.V. and
RICHARD E. GOODRICH

By their attorneys,

/s/ John F. Batter III
John F. Batter III (admitted *pro hac vice*)
John A. Valentine (JV-1064)
Colin M. Huntley
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel:  202-663-6000
Fax:  202-663-6363

Dated:  April 2, 2007

- 25 -